***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representative. The Full Commission affirms the Opinion and Award of Deputy Commissioner DeLuca, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. At such time, an employment relationship existed between Plaintiff and Employer-Defendant.
3. At all relevant times, the Employer-Defendant was a duly-qualified Self-Insured.
4. The Industrial Commission has jurisdiction of the parties and the subject matter herein.
5. All parties are correctly designated and there is no question as to misjoinder or nonjoinder of the parties.
6. Plaintiff received STD/LTD benefits from October 15, 2005 through April 17, 2008.
7. The issue for resolution is whether Plaintiff suffered a compensable injury or occupational disease and, if so, to what benefits he is entitled.
8. Stipulated exhibits 1-3 and Defendants' exhibits 1 and 2 were admitted into the record. Plaintiff's exhibit 1 was identified, but as it was incorporated as part of Defendants' exhibit 2, it was not admitted as a separate exhibit.
 ***********
Based upon all the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on July 28, 1955 and is a high school graduate with approximately three years of college. Plaintiff's work history includes construction jobs with two different companies. *Page 3 
2. Plaintiff was employed by Employer-Defendant as a delivery courier for approximately 20 years prior to October 2005. Plaintiff worked at least 10 hours per day, four days a week, averaging 45 hours per week and was paid at a rate of $18.92 her hour.
3. On a daily basis, Plaintiff was required to load multiple trucks by taking packages off a conveyor belt that conveyed a package every five to six seconds. Plaintiff would twist and place packages behind a truck. Plaintiff loaded two to three trucks at a time on average and would load and deliver packages ranging in weight from one to 150 pounds. He loaded an average of approximately 100 packages per truck per day.
4. As part of his job, Plaintiff also delivered large bulk items to auto parts departments, farm and tractor supplies, and various industrial businesses, making sixty to seventy stops each day. In performing his duties, Plaintiff had to climb out of and into his truck to get packages at every stop which required him to bend, twist, and lift at every stop. At the end of his delivery route, Plaintiff would make another 25 to 30 stops for package pick ups, load these packages, and unload them at the end of his work day.
5. Plaintiff complained of back pain over a number of years, and has sought and received treatment for these back complaints. Plaintiff treated periodically with Chiropractor Dr. Gary Wojeski for back pain.
6. Plaintiff last worked for Employer-Defendant on or about September 28, 2005. Prior to his last day worked, Plaintiff scheduled vacation for October 3-7, 2005. Plaintiff traveled by car to the Pocono Mountains in Pennsylvania with his wife during that time. During their vacation, Plaintiff experienced significant pain in his low back, requiring him to seek medical attention. *Page 4 
7. Plaintiff saw Dr. Wojeski on October 10, 2005. Because of Plaintiff's complaints of debilitating back pain, Dr. Wojeski ordered that an MRI be performed.
8. An MRI was done on October 12, 2005, which showed disc extrusion at L3-4 and L4-5 with severe nerve compression.
9. Thereafter, Plaintiff's back pain became so severe that he was admitted to Lenoir Memorial Hospital on October 24, 2005, under the care of his primary care physician, internist Dr. Rupert Jilcott. After four days he was transferred to Pitt Memorial Hospital under the care of Dr. Scot Reeg.
10. On October 31, 2005, Dr. Reeg performed a left-sided L4-5 and right-sided L5-S1 decompressive laminotomy with partial facetectomy and excision of left-sided L4-5 herniation on Plaintiff.
11. Plaintiff showed some initial improvement following his surgery, but still had aching in his left calf and soreness and weakness in his back.
12. Upon Plaintiff's release on February 28, 2006, Dr. Reeg wrote that Plaintiff had burning in his leg and occasional radiculitis. He prescribed Lyrica for the Plaintiff, and gave him light-duty restrictions, suggesting that an FCE may be appropriate to determine his work and functional capabilities. Dr. Reeg testified "I would say he likely developed an acute disc herniation at the time that prompted his admission to the hospital, and it was not likely something that had been there for months or years." Dr. Reeg acknowledged in his testimony "most people over the age of 40 or 50 are going to show some level of degenerative disk disease on an MRI." Dr. Reeg also testified Plaintiff's employment did not cause the back condition he treated but significantly contributed to that condition. He further opined that Plaintiff's job put him at increased risk of developing his back condition compared to one in a more sedentary job. *Page 5 
13. Thereafter, Plaintiff continued under the care of Dr. Jilcott and continued to complain of pain in his back and leg. His condition continued to decline throughout early 2006, and in August Dr. Jilcott ordered another MRI of Plaintiff's lumbar spine.
14. This MRI was performed on August 15, 2006. The MRI revealed broad-based disc herniations in the left lateral recess at L4-5 and in the right lower recess at L5-S1 with nerve displacement.
15. Based upon the MRI findings, Dr. Jilcott referred Plaintiff to Dr. Robert Lacin.
16. Plaintiff was examined by Dr. Lacin on August 29, 2006, at which time Dr. Lacin recommended left L4-5 and right L5-S1 re-exploration and radiculolysis and a possible discectomy at the right L5-S1. Dr. Lacin performed this procedure on September 28, 2006.
17. Following the surgery, Dr. Lacin noted that Plaintiff's lower extremity symptoms had resolved, but that he still had soreness and stiffness in his back. Dr. Lacin saw Plaintiff again on December 19, 2006, and noted that he still had back pain, and recommended physical therapy.
18. Dr. Lacin opined that it would take "quite a bit of time" for Plaintiff's recovery, and that he remain out of work for a few more weeks. Further, Dr. Lacin noted that he did not think Plaintiff could or should return to work with FedEx as a courier, and that when he was cleared to return to work in some capacity it should be in such jobs as dispatcher or any other office job.
19. On January 30, 2007, Dr. Lacin released Plaintiff from his care with permanent sedentary or at most light duty restrictions with no lifting. He again noted that Plaintiff should not return to work as a courier, as it required lifting and driving. *Page 6 
20. Plaintiff continued to have back pain and radiation to the lower extremities, and Dr. Jilcott referred him back to Dr. Lacin for examination. In his deposition, Dr. Jilcott testified that Plaintiff's employment placed him at increased risk for his back condition and significantly contributed to that condition
21. Plaintiff saw Dr. Lacin on July 3, 2007, and Dr. Lacin recommended pain management with injections and referred the Plaintiff to Dr. Ronald Long. Dr. Lacin did not think at that time that Plaintiff's condition was anything that could be relieved with surgery. Plaintiff was unable to see Dr. Long because his health insurance would not pay for the visits to that practice. He was then directed to Dr. Christopher Godbout at Carolina Back Institute.
22. Plaintiff was seen in Dr. Godbout's office on November 15, 2007. After examination, Dr. Godbout recommended steroid injections, aquatic physical therapy, and an EMG test.
23. On November 26, 2007, Dr. Lacin took the Plaintiff out of work, saying that he could not lift anything, could not sit, stand or push.
24. Plaintiff continued under the care of Dr. Godbout, receiving an epidural injection and participating in aquatic physical therapy. This was of little benefit.
25. Plaintiff also underwent EMG studies, which showed evidence of right S1 radiculopathy as well as possible peripheral neuropathy. At that time, Dr. Godbout recommended another MRI for the Plaintiff, as well as examination for a neuromuscular stimulator. However, he was not able to get the stimulator because his insurance would not cover it.
26. On December 18, 2007 Plaintiff underwent the MRI ordered by Dr. Godbout performed on December 18, 2007. It showed a herniation at L5-S1, as well as a bulge at L4-5 *Page 7 
with an annular tear. There was also a disc protrusion and annular tear at L3-4. At his follow-up with Dr. Godbout, Plaintiff was given different medications, including Duragesic patches, and was scheduled for additional injections.
27. Plaintiff was seen again by Dr. Lacin on March 10, 2008. Dr. Lacin reviewed the most recent MRI results, and determined that he could not recommend another surgery for Plaintiff. He opined that Plaintiff's back pain syndrome "would be very difficult to treat." He recommended that the Plaintiff seek a second opinion on surgery, and referred him to Dr. Jaikumar in Chapel Hill.
28. On March 17, 2008, Dr. Lacin stated that Plaintiff was suffering from a "severe problem" in his lower back, and that the problem was "incapacitating." He further stated that the Plaintiff would never be able to return to his job at FedEx.
29. On April 9, 2008, Dr. Lacin wrote that Plaintiff's back problems had rendered him "incapacitated, unable to sit, stand or bend for any extended period of time." He went on to state that "regardless of any treatment modality, this patient will be unable to return to any type of gainful employment until further notice." Dr. Lacin testified there is no data that shows that FedEx or UPS delivery people have a higher incidence of lumbar disk herniation or back problems than other professions. He also testified that Plaintiff's disks had not degenerated significantly.
30. Plaintiff saw Dr. Jaikumar on March 31, 2008. He agreed he had nothing to offer the Plaintiff from a surgical standpoint, and recommended pain management to try to alleviate Plaintiff's pain.
31. Plaintiff completed a series of epidural injections with Dr. Godbout, and had very little relief from these. Dr. Godbout opined that a spinal cord stimulator might provide Plaintiff *Page 8 
some relief and improve his quality of life. To date, Plaintiff has not been able to have a stimulator implanted, as he has no money for the procedure or coverage to have the procedure done.
32. Dr. Godbout testified that Plaintiff's employment with Employer-Defendant did not place him at increased risk for developing degenerative disk disease or cause Plaintiff's degenerative disk disease. Dr. Bolstad testified that working as a courier for FedEx does not place plaintiff at a higher risk of developing a disk herniation later.
33. The opinions of Dr. Lacin and Dr. Godbout are given the greatest weight as they provided the majority of medical treatment and specialize in treatment of the spine.
34. The undersigned find that the competent evidence of record fails to establish that Plaintiff's employment placed him at increased risk for developing degenerative disk disease, or caused or significantly contributed to Plaintiff's degenerative disk disease.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission finds the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain an injury by accident arising out of and in the course of his employment or a specific traumatic incident of the work assigned with Employer-Defendant. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's degenerative disk disease is not an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with Employer-Defendant and which excluded all ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13);Booker v. Duke Medical Center, 297 N.C. 458 (1979). *Page 9 
3. Plaintiff's employment with Employer-Defendant did not expose him to an increased risk of developing degenerative disk disease as compared to members of the general public not so employed. N.C. Gen. Stat. § 97-53(13).
4. Plaintiff's employment with Employer-Defendant did not cause the degenerative disk disease. N.C. Gen. Stat. § 97-53(13).
5. Plaintiff's claim, therefore, is not compensable under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §§ 97-2(6); 97-53(13).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Plaintiff's is hereby DENIED.
2. Each side shall bear its own costs.
This the __ day of December, 2009.
 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DANNY L. McDONALD COMMISSIONER